# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 18, 2013

## ANTHONY WHITED v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Wilson County**
**No. 07-0138    David E. Durham, Judge**

---

**No. M2013-00382-CCA-R3-PC    Filed October 18, 2013**

---

The petitioner, Anthony Whited, appeals the summary dismissal of his *pro se* petition for post-conviction relief, arguing that he presented a colorable claim for relief and that he should, therefore, have been afforded the assistance of post-conviction counsel and an evidentiary hearing. We agree. Accordingly, we reverse the judgment of the post-conviction court and remand for the appointment of post-conviction counsel and an evidentiary hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JEFFREY S. BIVINS, J., joined.

Anthony Whited, Whiteville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Brian W. Fuller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In July 2009, the petitioner was convicted by a Wilson County jury of second degree murder for the stabbing death of Charles Kieren and sentenced by the trial court to twenty years at 100% in the Department of Correction. This court affirmed the conviction and sentence on direct appeal, and our supreme court denied the petitioner's application for permission to appeal. State v. Anthony Whited, No. M2010-00612-CCA-R3-CD, 2011 WL 6892352 (Tenn. Crim. App. Dec. 27, 2011), perm. app denied (Tenn. May 16, 2012).

Our direct appeal opinion reveals that the victim was a neighbor of the petitioner, who lived in the other side of the two-family duplex in which the victim and his family lived. Id. at *1. At trial, the victim's mother reported that she did not know the petitioner well but that her family had had "a few little arguments [with him], such as when he called the animal shelter because their cat was on his side of the porch." Id. She said that she was taking a nap on the afternoon of July 29, 2006, when one of her neighbors knocked on her door to inform her that the victim had just been stabbed. That neighbor, Mitchell Slade Dyer, was outside with his wife and a friend at the time of the petitioner's altercation with the victim, and all three were witnesses to the confrontation between the two men. All three testified that the episode began when the petitioner started sprinkling something around a tree in the front yard. When asked what he was doing, the petitioner replied that he was "warding off evil spirits," which precipitated a verbal and physical altercation between himself and the victim. Our direct appeal opinion provides the following summary of the eyewitnesses' trial testimony:

> Thomas Wayne Hampton testified that he had lived on Martin Avenue for ten years. On July 29, 2006, he was helping his friend, Mitch Dyer, move out of his duplex on Martin Avenue. Mr. Hampton knew that the victim and the [petitioner] were Mr. Dyer's neighbors, but he did not know them personally. He recalled seeing the victim coming in and out of his house and cleaning out his van throughout the day. He was standing on the front porch of Mr. Dyer's house when he saw the [petitioner] sprinkling something around a tree in front of his house. Mr. Hampton testified that the [petitioner] told him and Mr. Dyer that "he was warding off the spirits." He heard the victim, who "was on his way outside," ask the [petitioner] what he was doing, and then the victim and the [petitioner] began "a hollering match." The [petitioner] said, "F*** you," to the victim. Mr. Hampton testified that the victim "walked up to" the [petitioner] and told him "to get back on [his] side." He said that "a little altercation broke out," but "no punches were thrown." Mr. Hampton thought that the [petitioner] pulled out a pocket knife at that point, and he and Mr. Dyer yelled at the [petitioner] to put the knife away. The [petitioner] put his knife into his pocket, and the [petitioner] and the victim both "squared off" into "a boxing stance." Mr. Hampton testified that the [petitioner] kicked the victim's leg, and the victim knocked the [petitioner]'s hat off of his head. He recalled that "maybe a couple more little punches were thrown" before the [petitioner] "pulled the knife back out again." Mr. Hampton said that the [petitioner] lunged at the victim and stabbed him in the heart once. The victim walked away and collapsed in his driveway. Mr. Hampton testified that he told the [petitioner] to go inside, which he did.

On cross-examination, Mr. Hampton recalled that after the [petitioner] stabbed the victim, the victim said, "I can get a knife, too."

Mitchell Slade Dyer testified that on July 29, 2006, he lived at 299-B Martin Avenue, next door to the duplex where the victim and the [petitioner] lived. He and his wife were moving out of their home that day, with the help of Thomas Hampton. Mr. Dyer recalled seeing the [petitioner] outside with a bag sprinkling something around the tree in the duplex's front yard. When Mr. Hampton asked what he was doing, the [petitioner] responded that "he was warding off evil spirits." Mr. Dyer also saw the victim cleaning out his van in his driveway. He said that the victim responded to the [petitioner]'s statement by saying "something like, '[W]hat did you say[?]'" Mr. Dyer testified that the [petitioner] and the victim began "bickering back and forth," and that they were "kind of squared with each other . . . like they were squaring off maybe to fight or talking kind of harsh words to each other." He said that the victim "walked up" and the [petitioner] "reached [into] his pocket and clicked open a pocket knife." Mr. Dyer testified that Mr. Hampton "hollered" to the [petitioner], telling him to put the knife away, and the [petitioner] complied. According to Mr. Dyer, the [petitioner] kicked the victim in the shin, and the victim lunged at the [petitioner], knocking the [petitioner]'s hat off of his head. Mr. Dyer said that they began "tussling," describing it as a "mild fist fight." He testified that they were moving across the yard, away from Mr. Dyer's house, until the victim turned around and began walking back toward the driveway. Mr. Dyer said that the victim was bleeding, but he managed to walk several steps before he stopped and laid down. He testified that, while Mr. Hampton stayed with the victim, he went to the victim's door to get his mother to come outside. Mr. Dyer recalled that Mr. Hampton told the [petitioner] to go inside his house, and the [petitioner] complied.

On cross-examination, Mr. Dyer testified that he saw the victim's brother break a window and say, "'I'm going to kill the mother f***er.'"

Christian Dyer, Mitchell Dyer's wife, testified that on July 29, 2006, she and her husband were moving out of their home with the help of Thomas Hampton. She said that they lived next door to the duplex where the victim and the [petitioner] lived. Mrs. Dyer testified that she saw the [petitioner] sprinkling something around a tree and that her husband asked him what he was doing. The [petitioner] responded that he was sprinkling dust to ward off evil spirits. Mrs. Dyer saw the victim come outside and heard him ask the [petitioner] what he was doing. She did not recall the [petitioner]'s response

to the victim. Mrs. Dyer testified that the [petitioner] pulled out a knife but put it away at Mr. Hampton's request. She said that as the altercation escalated, the men moved across the front yard. She called 911 as soon as the altercation began, so she was already on the phone with the dispatcher when she saw the victim turn around, walk back toward the driveway, and collapse. She said that the victim was "real pale," had a "stunned look" on his face, and he was bleeding in the area underneath his rib cage. She stayed with the victim until the police and medical personnel arrived. Mrs. Dyer said that because her focus was on the victim she was unaware of the [petitioner]'s actions after the victim collapsed.

Id. at *1-2.

In a statement to police immediately after the crime, the petitioner said that he and his neighbors had "'been having a feud'" for the past couple of weeks about the neighbors' cats, that the victim confronted him as he was taking his trash out, and that the victim took a swing at him, knocking off his hat and delivering a glancing blow to the side of his head. Id. at *3. The petitioner stated that he responded by taking out his knife and warning the victim not to touch him again. He said that the victim then "jumped at [him] and stepped in to [the] knife." Id.

On December 17, 2012, the petitioner filed a *pro se* petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Specifically, he alleged that counsel was ineffective for failing "to conduct investigations into petitioner's mental illness and to seek [a] competency hearing"; for telling the jury during opening statements that witnesses would testify that the victim lunged into the petitioner's knife, when no evidence in support of those statements was presented at trial; for waiving issues regarding the medical examiner's testimony by failing to make contemporaneous objections at trial; for failing to file a pretrial objection to the State's use of the petitioner's prior convictions to enhance his sentence; for failing to file a motion to recuse and disqualify the trial judge on the basis that the judge was employed by the district attorney's office at the time the crime occurred; and for failing to employ and call an expert medical witness at trial to rebut the medical examiner's testimony regarding the cause and manner of death.

On January 4, 2013, the post-conviction court entered an order summarily dismissing the petition on the basis that it failed to state a colorable claim for post-conviction relief. With respect to the petitioner's first allegation that counsel was ineffective for not investigating his mental health or requesting a mental evaluation, the court found that the petitioner did not "set forth any allegations of fact as required by T.C.A. § 40-30-104(e), supporting his claim that had he been evaluated a licensed, competent expert witness would

-4-

have testified in support of this theory at trial." The court further found that there was nothing in the petitioner's "answers/comments in the pre-sentence report filed in this matter" that "would indicate a mental evaluation would be warranted." Finally, the court found that it was "clear from the record that trial counsel chose to pursue a self-defense, and not an insanity defense" and that this trial strategy decision by counsel did not render counsel ineffective.

The post-conviction court found that the petitioner's allegation that counsel was ineffective for failing to hire a medical expert to refute the testimony of the medical examiner consisted of "only allegations without factual support that the hiring of a forensic pathologist . . . would have resulted in a different cause/manner of death, and/or that as a result, a different verdict would have been rendered." The court further found that any motion to disqualify the trial judge would have been denied and that the petitioner's other allegations of ineffective assistance were either unsupported by fact or were decisions that fell within counsel's sound trial strategy.

## ANALYSIS

The petitioner argues on appeal that he alleged facts in support of his ineffective assistance of counsel claims and that the post-conviction court therefore erred in summarily dismissing his petition without the appointment of counsel or an evidentiary hearing. We review the post-conviction court's dismissal of the petition, as an issue of law, *de novo* on the record without a presumption of correctness. See Burnett v. State, 92 S.W.3d 403, 406 (Tenn. 2002).

Section 40-30-106 of the Post-Conviction Procedure Act provides in pertinent part:

(d) The petition must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings. Failure to state a factual basis for the grounds alleged shall result in immediate dismissal of the petition. If, however, the petition was filed pro se, the judge may enter an order stating that the petitioner must file an amended petition that complies with this section within fifteen (15) days or the petition will be dismissed.

(e) If a petition amended in accordance with subsection (d) is incomplete, the court shall determine whether the petitioner is indigent and in need of counsel. The court may appoint counsel and enter a preliminary order

if necessary to secure the filing of a complete petition. Counsel may file an amended petition within thirty (30) days of appointment.

(f) Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

Tenn. Code Ann. § 40-30-106(d)-(f) (2006). A petition presents a "colorable claim," sufficient to withstand summary dismissal, when the facts alleged, "'taken as true'" and "'in the light most favorable to [the] petitioner'" would entitle the petitioner to relief under the Post-Conviction Procedure Act. Arnold v. State, 143 S.W.3d 784, 786 (Tenn. 2004) (quoting Tenn. Sup. Ct. R. 28, § 2(H)).

In support of his claim that counsel was deficient for not investigating his mental health issues or requesting a mental evaluation, the petitioner alleges in his petition that the fact that the altercation in the case was initiated when the petitioner was sprinkling dust to ward off evil spirits, "coupled with [the] fact that, at the time of the crime, [p]etitioner was taking prescription drugs, (olanzipine) to treat him for hallucinations and for personality disorder with borderline traits of schizophrenia, was reason for counsel to investigate [the petitioner's] mental illness and to seek a competenc[y] hearing." The petitioner further alleges that there was a likelihood of success had such an insanity defense been pursued and that counsel's failure to investigate his mental health therefore constituted ineffective assistance. In our view, the petition alleged a sufficient factual basis for the claim of ineffective assistance of counsel based on counsel's alleged failure to investigate the petitioner's mental health and competency to withstand summary dismissal.

We also think that the petition alleged a sufficient factual basis to withstand summary dismissal of the claim that counsel was ineffective for failing to raise contemporaneous objections to the medical examiner's testimony. On direct appeal, the petitioner raised an issue with respect to whether the medical examiner's testimony about the amount of force required to inflict the victim's knife wound was outside his area of expertise. This court, however, deemed the issue waived based on counsel's failure to raise a specific, contemporaneous objection to the testimony at trial. Anthony Whited, 2011 WL 6892352, at *8. In his petition for post-conviction relief, the petitioner alleges that trial counsel was defective for failing to preserve the issue for appeal by not objecting to the specific testimony at trial. He further alleges that the medical examiner's testimony that "significant direct force" was required for the injury was "damaging" to his case because it "created an

-6-

inference that [p]etitioner intended to kill the victim by using significant force" and contradicted the petitioner's claim that the injury occurred when the victim lunged into his knife.

In sum, we conclude that the petition, especially when viewed in the more lenient light afforded a *pro se* petitioner, contains sufficient allegations of fact to present a colorable claim for post-conviction relief. Accordingly, we reverse the judgment of the post-conviction court and remand for the appointment of post-conviction counsel and for an evidentiary hearing.

## **CONCLUSION**

Following our review, we reverse the summary dismissal of the petition and remand to the post-conviction court for the appointment of counsel and an evidentiary hearing.

_____
ALAN E. GLENN, JUDGE